Robert Wright and Elizabeth Wright (deceased) v. Commissioner.
Wright v. Commissioner
Docket No. 3900-64.
United States Tax Court
T.C. Memo 1967-86; 1967 Tax Ct. Memo LEXIS 176; 26 T.C.M. (CCH) 425; T.C.M. (RIA) 67086; April 21, 1967
*176 Held, that the respondent's computation, by the percentage markup method, of the petitioner's gross receipts from the operation of a retail liquor store was proper, subject to certain adjustments. Crawford McDonald, 150 E. Court, Memphis, Tenn., for the petitioners. Vallie C. Brooks, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1958, 1959, 1961, and 1962 in the respective amounts of $310.63, $1,310.87, $3,186.58, and $3,146.72. The issue with respect to the taxable years 1961 and 1962 is whether the petitioners understated their taxable income derived from the operation of a liquor store and, if so, the extent of the understatement. There is also in issue the question whether the petitioners *177 sustained net operating losses for those years which may be carried back and applied as net operating loss deductions for the taxable years 1958 and 1959. Findings of Fact Some of the facts were stipulated and the stipulations are incorporated herein by this reference. The petitioners were, at the time of the filing of the petition, husband and wife residing in Memphis, Tennessee. They filed joint Federal income tax returns for the taxable years 1958, 1959, 1961, and 1962 with the district director of internal revenue, Nashville, Tennessee. Elizabeth Wright died intestate in 1964 and there has been no administration of her estate. Robert Wright will hereinafter be referred to as the petitioner. During the taxable years 1958, 1959, 1961, and 1962 the petitioner operated in Memphis, as a sole proprietorship, a retail liquor store known as Altruist Liquor Store, employing the accrual method of accounting. He has operated a retail liquor store in Memphis under a license obtained from the State of Tennessee since the sale of liquor was legalized in the city about 1933. The petitioner also operated, as sole proprietorships, a bail bond agency in Memphis, and a golf course. During *178 1961 and 1962 the petitioner spent most of his time at the bail bond agency. He was present at the liquor store each evening for 1 to 2 1/2 hours between 7:00 and 9:30. The building occupied by the liquor store contained a sales room in the front portion and an office and storage room in the rear. In the sales room the liquor and wine which was offered for sale to the public was arranged on shelves which allowed all merchandise to be seen by the sales clerk standing behind the cash register. The petitioner did not keep large quantities of liquor and wine stored in the storage room, there being on hand generally only 2 or 3 cases of wine and some broken case lots of liquor. During the taxable years 1961 and 1962 the petitioner employed 4 women as regular sales clerks in the liquor store. Their names and the period of their employment by the petitioner are shown below: Period of Employment
Name
From
To
Denise Hawkins
1958
Summer 1965
Eunice Brent
August 1961
Early 1966
Lucille Hill
Late 1960
Mid-April 1961
Willa Monroe
Before 1961
November 1961 During such years the petitioner also employed O. M. Burks, whose primary job in the liquor store *179 was checking in the liquor and wine when delivered and putting it on the shelves. He also occasionally waited on customers. Burks had been employed by the petitioner since 1933. The liquor store was open every day, except Sundays and holidays, from 8:00 a.m. to 11:00 p.m. The women clerks worked in two shifts. One shift was from 8:00 a.m. to 4:00 p.m. and the second shift was from 4:00 p.m. to 11:00 p.m. Burks customarily opened the store in the morning and closed it at night. He was generally present at the store during the working hours, except that usually he went home for about 2 hours between 5:00 p.m. and 7:00 p.m. During the years 1961 and 1962 the minimum prices for retail liquor and wine sales were set by the statutory law of the State of Tennessee. Since April 20, 1959, section 57-701(3), Tennessee Code Annotated, has provided that the minimum price to be charged for liquor and wine sold at retail in the State of Tennessee shall be computed as follows: The retailer's list price of distilled spirits shall not be less than the retailer's cost price, plus, where sales are made in less than quantities of one (1) case, a markup of at least twenty-seven and one-half per cent *180 (27.50%) of the retailer's cost price, or plus, where sales are made in quantities of one (1) case or more, a markup of at least ten per cent (10%) of the retailer's cost price. The retailer's list price of wines shall not be less than the retailer's cost price, plus, where sales are made in quantities of less than one (1) case, a markup of at least forty per cent (40%) of the retailer's cost price, or plus, where sales are made in quantities of one (1) case or more, a markup of at least twenty per cent (20%) of the retailer's cost price. The retailer's cost price shall be calculated upon the actual wholesale sale price, plus any tax that may be imposed upon the sale at wholesale. The above provisions of section 57-701(3) were applicable to all sales of liquor and wine made by the Altruist Liquor Store in 1961 and 1962. In his operation of the Altruist Liquor Store in 1961 and 1962, petitioner instructed his employees to mark and sell liquor and wine in accordance with the prices listed in the monthly issues of the magazine "Southern Beverage Journal," which prices were in conformance with section 57-701(3), supra. With the exception of sales of liquor made to the petitioner's *181 accountants, [1] all sales of liquor made at the liquor store in the years in question were made at prices which were in accord with the prices set forth in the Southern Beverage Journal. The purchase invoices of the liquor store for the taxable years 1961 and 1962 show that of the total purchases made 88.1% and 89.3%, respectively, represented purchases of liquor and that 11.9% and 10.7%, respectively, represented purchases of wine. No records were kept during the years in question showing a breakdown between sales of liquor and sales of wine. In each of the years 1961 and 1962 the sales of liquor and wine were in the same proportions as the purchases thereof. During the taxable years 1961 and 1962 no records were kept showing the amount of sales of liquor or wine made at case prices. Most of the sales made at the liquor store consisted of single half pints, and the sales of wine were usually of single bottles, either pints or fifths. During *182 each of the taxable years 1961 and 1962 10 cases of liquor, in addition to that sold to the accountants, were sold at the case price. Sales at the liquor store were rung up on the cash register and the sales proceeds were placed in one of the cash register drawers. Each night about 9:00 p.m. the clerk who was on duty determined the total sales from the cash register tape and counted the money in the cash register drawers. She then placed the money in a bag and prepared a bank deposit slip. The petitioner was usually present and on some occasions he counted the money. He took the money and the deposit slip and customarily deposited the money in the bank the next day. After the register was checked out each night, it was ready for the next day's business and any sales made thereafter were included in the following day's sales. The clerk (or sometimes the petitioner) prepared a daily report showing the total cash to be accounted for (cash on hand at the beginning of the day, plus cash sales, plus other cash receipts) and the total cash accounted for (cash deposited, plus cash paid out, plus cash on hand at the end of the day). The petitioner employed an accounting firm to keep books *183 with regard to the liquor business. Once each month such accounting firm was furnished the daily reports, copies of the deposit slips, the cash register tapes showing total sales, receipts for bills paid by cash, and invoices and check stubs relating to purchases of inventory. From this material the accounting firm made entries in the journal and ledgers kept for the liquor business. At the end of each taxable year the accounting firm took an inventory of the liquor and wine on hand. Such accounting firm also prepared the petitioners' income tax returns for the years in question. Such firm, in computing the profit from the operation of the liquor store, relied upon the above information furnished it and took into account the annual inventory. In computing the petitioner's gross receipts from the liquor store, the accounting firm used the deposit slips and the cash register tapes, and also took into account the sales made to the accounting firm. The total on the cash register tapes included a 3% Tennessee retail sales tax, and in computing the gross receipts the accountant eliminated the portion representing the sales tax. In their returns for the taxable years 1961 and 1962 the *184 petitioners reported net operating losses. [2] In such returns the net profit or loss from the operation of the Altruist Liquor Store was computed as follows: 1961
1962
Total receipts
$136,494.68
$123,468.76
Opening Inventory
$ 25,860.10
$ 18,323.86
Merchandise purchased
116,376.60
105,291.08
Total
$142,236.70
$123,614.94
Less: Ending Inventory
18,323.86
16,597.95
Cost of Goods Sold
123,912.84
107,016.99
Gross Profit
$ 12,581.84
$ 16,451.77
Less: Business deductions
15,895.07
14,611.14
Net Profit (or loss)
($ 3,313.23)
$ 1,840.63
*185 During the taxable years 1961 and 1962 the petitioner paid to the wholesaler, when he made purchases of liquor and wine, a 3 percent privilege tax imposed by the city of Memphis. The cost of goods sold shown on the returns, as above set forth, included both the actual cost of the liquor and wine purchased and the 3 percent privilege tax. The 3 percent privilege tax was not included in the retailer's cost price in computing the liquor and wine prices published in the Southern Beverage Journal. During each of the taxable years 1961 and 1962 the petitioner withdrew liquor from the liquor store and gave it to various public officials, primarily policemen, and others in the city of Memphis. The quantity so given away amounted to 3 cases each year. The petitioner's purpose in making these gifts was to increase his bail bond business by influencing the recipients to refer to the petitioner individuals who were in need of bail bonds. The cost of such liquor was included in the cost of goods sold shown in the petitioners' returns. During the taxable years 1961 and 1962 the petitioner, in addition to the above withdrawals, frequently took bottles of liquor from the store to sell, no amount *186 being rung up on the cash register or reflected on the daily reports on account thereof. Sometimes the petitioner, or a clerk at his direction, would put a slip of paper in the cash register drawer indicating the amount of liquor taken. Sometimes, in the taxable years 1961 and 1962, friends of the petitioner would call at the liquor store and the clerks would permit them to take one or more bottles of liquor without payment therefor, pursuant to permission given to the clerks by the petitioner. Notations of these withdrawals were sometimes made in a book or stenographer's pad, showing the quantity and price. However, no amounts on account of these withdrawals were rung up on the cash register and no amounts were reflected on the daily reports. During the years 1961 and 1962 the petitioner's employees and customers broke the equivalent of about 1 case of liquor per year. In the notice of deficiency the respondent determined that the petitioner's income from the operation of the liquor store was understated in the return for the taxable year 1961 by the amount of $24,892, setting forth the following explanation: (a) It is determined that the cost of goods sold reported on Schedule *187 "C" of Altruist Liquor Store is overstated in the amount of $500.00 for merchandise given away which does not constitute an ordinary and necessary business expense. Accordingly, your taxable income is increased in the amount of $500.00. (b) It is determined that you realized additional income in the amount of $24,392.00, as determined by a percentage of mark-up method of reconstruction of income from the Altruist Liquor Store, as determined in Exhibit "A" attached, which you failed to report on your income tax return. Accordingly, your taxable income is increased in the amount of $24,392.00. In such notice the respondent made similar adjustments for the taxable year 1962 in the respective amounts of $500 and $15,453.04, with the same explanations. The detailed computations shown in exhibits attached to the notice of deficiency were as follows: 1961
1962
Cost of goods sold per returns
$123,912.84
$107,016.99
Less: Estimated cost of merchandise given away
(500.00)
(500.00)
Estimated cost of case sales (5)
(250.00)
(250.00)
Balance, cost of goods sold at retail
$123,162.84
$106,266.99
Cost of liquor sales included in above, estimated at 80%
$ 98,530.27
$85,013.60
Cost of wine sales included in above, estimated at 20%
24,632.57
21,253.39
Totals
$123,162.84
$106,266.99
Computation of corrected gross profit: Case lot sales, 10% of $250
$ 25.00
$ 25.00
Liquor sales: 1961, 27 1/2% of $98,530.27
27,095.82
1962, 27 1/2% of $84,013.60
23,378.46
Wine sales: 1961, 40% of $24,632.57
9,853.02
1962, 40% of $21,253.39
8,501.35
Corrected gross profit
$ 36,973.84
$ 31,904.81
Gross Profit Per Return
12,581.84
16,451.77
Income Increased
$ 24,392.00
$ 15,453.04
*188 Opinion The respondent recomputed the petitioner's gross receipts from his retail liquor business for the taxable years 1961 and 1962 by use of the so-called "percentage markup" method. It is now well established that if the respondent finds that a taxpayer's records are incomplete or inaccurate, he may resort to the percentage markup method in determining the taxpayer's taxable income. Bollella v. Commissioner, (C.A. 6) 374 F. 2d 96, Kurnick v. Commissioner, (C.A. 6) 232 F. 2d 678, and Bernstein v. Commissioner, (C.A. 5) 267 F. 2d 879, all affirming Memorandum Opinions of this Court; and Hyman B. Stone, 22 T.C. 893. The petitioner maintains that he kept accurate records, including daily reports and cash register tapes, that his returns prepared therefrom by an independent accounting firm properly reflect the income which he derived from the business, and that therefore the use of the percentage markup method is not warranted. We have carefully considered the evidence presented and are satisfied that the petitioner's records and returns did not reflect the correct taxable income from the liquor business in the taxable years *189 1961 and 1962. During such years the law of Tennessee (section 57-701(3), Tennessee Code annotated) required that retail sales of liquor be made at not less than the retailer's cost price plus a markup of at least 27 1/2 percent for sales of less than a case, and a markup of at least 10 percent for sales in quantities of one case or more. The law also required that retail sales of wine be made at not less than the retailer's cost price plus a markup of at least 40 percent for sales of less than a case, and a markup of at least 20 percent for sales in quantities of one case or more. The petitioner and his employees testified that the sales were made in conformity with Tennessee law. We have found that 88.1 percent of the total sales in 1961 represented sales of liquor and 11.9 percent represented sales of wine, and that 89.3 percent of the total sales in 1962 represented sales of liquor and 10.7 percent represented sales of wine. The evidence also establishes that most of the sales consisted of single bottles, or at least less than case lots. Upon the evidence we have found that in each year the petitioner sold at case prices the equivalent of 10 cases of liquor, in addition to sales *190 to an accounting firm. Upon the record we cannot find that there were any sales of wine at case prices. There is no dispute between the parties with respect to the cost of liquor and wine purchased, the opening and closing inventories, and hence the amount of liquor and wine to be accounted for. Giving effect to the percentage markups required by Tennessee law and taking into consideration the relatively small amounts of merchandise broken and given away, it is reasonable to conclude that the sale of liquor and wine resulted in gross receipts far in excess of the amounts reported on the petitioner's income tax returns. The petitioner contends that his employees stole both cash and liquor and wine from the store and that for this reason, principally, the actual gross receipts from sales were less than the amount which would result from a calculation of gross receipts upon the percentage markup method. However, he has not established that his employees did in fact steal cash and merchandise. He merely testified that he heard reports, and therefore suspected, that some of his employees were stealing from him. He also stated that on some occasions, whether in the years in question *191 is not clear, he counted more money in the cash register drawer than was shown on the cash register tape and that from this he concluded that some of his employees intended to steal the excess cash. However, he stated that he never saw any employee make a sale which was not properly rung up on the cash register, that he did not actually know that any of them were stealing, and that he could not prove that they were stealing. All of the persons who had been employed in 1961 and 1962 were called as witnesses by either the petitioner or the respondent. Each of the sales clerks testified that she had never stolen from the store and had never failed to ring up a sale which was made. The employees testified generally to the effect that they had not seen any other employee steal any cash or liquor or fail to ring up a sale. On the other hand, the evidence establishes that the petitioner took liquor from the store and permitted his friends to withdraw liquor from the store, and that no amounts were rung up on the cash register in such instances. The petitioner testified that on 8 or 10 occasions each year he would take a couple of bottles from the store to sell to friends, but that he either *192 paid for the liquor or put a ticket in the cash register drawer and made payment later. However, some of his employees testified that his withdrawals of liquor were frequent and substantial, and that although he sometimes left a piece of paper in the cash register drawer indicating the amount of liquor taken, they had never seen him make payment for such liquor. The petitioner did not explain when and how payment was made in those instances when a notation was left in the drawer or whether any payment that was made was reflected in the records and in the returns. The evidence shows that in those instances when petitioner's friends withdrew liquor from the store, notations of the withdrawals were sometimes made in books or stenographers' pads showing the quantity and price. However, as stated, no amounts were rung up on the cash register on account thereof and hence the transactions were not shown in the daily reports. The record does not show what became of these books or stenographers' pads, nor does the record show when or to whom payment may have been made for the liquor so withdrawn, or that any payments found their way into the books or returns of the petitioner. We think it must *193 be concluded that a substantial amount of proceeds from sales of liquor were not reflected in the petitioner's books and returns for the taxable years 1961 and 1962. At least the petitioner, upon whom rests the burden of proof, has failed to show that all amounts received from the sale of liquor were reflected in the returns. Under the circumstances, the respondent's computation of gross receipts by use of the percentage markup method was not unreasonable. The petitioner complains that the respondent did not attempt to corroborate the correctness of his determination on the percentage markup method by reference to any other method, such as the net worth method or the bank deposit method. However, the respondent is not required to so corroborate his determination. See Bernstein v. Commissioner, supra. The petitioner also contends that the respondent made certain errors in applying the percentage markup method. He first contends that the cost of goods sold, upon the basis of which the respondent calculated the sales price, included the 3 percent Memphis privilege tax, whereas in pricing its goods for sale the petitioner applied the statutory percentages to the cost *194 after eliminating such tax. The respondent agrees that he erred in this respect. In the recomputation under Rule 50 proper adjustment will be made by eliminating such tax from the cost of goods sold for the purpose of applying the percentage markup. The petitioner also points to the fact that in the notice of deficiency the respondent determined that in each year 80 percent of the sales constituted sales of liquor and 20 percent of the sales constituted sales of wine. As noted hereinabove, we have found that in 1961 88.1 percent of the sales constituted sales of liquor and 11.9 percent of the sales constituted sales of wine, and that in 1962 89.3 percent of the sales constituted sales of liquor and 10.7 percent of the sales constituted sales of wine. The petitioner also contends that the respondent was in error in assuming that the petitioner sold only the equivalent of 5 cases of liquor at case lot prices in each of the years 1961 and 1962. We have found that, in addition to sales at case prices made to an accounting firm, the petitioner sold the equivalent of 10 cases of liquor at case prices in each of such years. Proper adjustments will be made in these respects in the recomputation, *195 under Rule 50, of the gross receipts. In this connection, it is noted that the respondent determined that the average cost of a case of liquor was $50, and that petitioner does not dispute this. Accordingly, such figure will be used in applying the markup with respect to liquor sold at case prices. On brief the petitioner contends that in computing the gross receipts the respondent erred in failing "to take into account the fact that while the 3 percent State of Tennessee sales tax was paid by the petitioner, it was not added on to the price lists in the 'Southern Beverage Journal' which was the price charged customers." While it is true that the prices listed in the Southern Beverage Journal did not include a retail sales tax, the petitioner has failed to show that he did not charge his customers the 3 percent sales tax over and above the sales prices listed in such publication. Indeed, each page of such publication listing sales prices specifically states "State Sales Tax Of 3% To Be Added To All Resale Prices." Accordingly, we cannot conclude that the respondent erred in this respect as claimed by the petitioner. There remains a further adjustment to be made in the recomputation *196 under Rule 50. In his determination the respondent estimated that in each of the taxable years 1961 and 1962 the cost of merchandise given away was $500 (10 cases at a cost of $50 each). He accordingly eliminated such $500 each year from the cost of goods sold. He thus eliminated the $500 from the base to which he applied the percentage markup, and in effect disallowed the petitioner a deduction of $500 for gifts of merchandise. At the hearing the petitioner unequivocally testified that the amount which he gave away amounted to only 3 cases per year. Accordingly, in the recomputation $150 (3 cases at a cost of $50 per case) instead of $500 will be eliminated from the petitioner's cost of goods sold. However, since the petitioner's purpose in making the gifts of liquor was to increase his bail bond business by influencing the recipients to refer to the petitioner individuals who were in need of bail bonds, the cost of the 3 cases of liquor constitutes a deductible ordinary and necessary expense of such bail bond business, and such deduction will be allowed in the recomputation under Rule 50. Decision will be entered under Rule 50. Footnotes
1. Sales of liquor to the petitioner's accountants were made at 10% above cost regardless of the amount sold. The sales to the accountants amounted to $604.25 in 1961 and $155.86 in 1962. Such sales were not rung up on the cash register.↩
2. On January 2, 1963, the petitioners filed an application for tentative carryback adjustment for the taxable year 1958 on account of a net operating loss of $9,198.40 reported on their 1961 income tax return. On April 17, 1963, they filed an application for tentative carryback adjustment for the taxable year 1959 on account of a net operating loss of $1,185.78 reported on their 1962 income tax return. Such tentative carryback adjustments were allowed by the respondent and as a result thereof the petitioners were refunded $310.63 for the taxable year 1958 and $1,310.37 for the taxable year 1959.↩